THE McCLAIN FIRM                                    Attorney for Plaintiff
BY: Cary B. McClain, Esq.
Attorney ID 70720
BY: Robert M. Abernethy, Esq.                      *Jury Trial Demanded*
Attorney ID 326776                                 *Assessment of Damages*
901 Stony Lane                                     *Hearing Required*
Gladwyne, PA 19035
(610) 649-6191

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DARIN AND TIFFANY McMAHON, | : CIVIL ACTION |
| Husband and Wife | : |
| 16042 Fox Cub Circle | : Case No. 5:19-cv-5292-JMG |
| Milton, DE 19968 | : |
|  | : |
| AND | : |
|  | : |
| SEAN McMAHON | : |
| 22190 Jefferson Road | : |
| Lincoln, DE 19960 | : |
| Plaintiffs, | : |
|  | : |
| v. | : |
|  | : |
| ROCKWELL TACTICAL GROUP, LLC | : |
| 1151 Beaver Valley Pike | : |
| Lancaster, PA 17602 | : |
|  | : |
| AND | : |
|  | : |
| THREAT ASSESSMENT AND | : |
| TACTICAL SOLUTIONS GROUP, LLC | : |
| 103 Kraemer Avenue | : |
| Stroudsburg, PA 18360 | : |
|  | : |
| AND | : |
|  | : |
| JARED ROSS | : |
| 234 Springview Road | : |
| Carlisle, PA 17015 | : |

AND                                                      :
                                                         :
BRANDON KEHR                                             :
125 Elizabeth Street, Apartment A                        :
East Stroudsburg, PA 18301                               :
                                                         :
AND                                                      :
                                                         :
CODY SAYLOR                                              :
2033 Pennsylvania Avenue                                 :
Allentown, PA 18109                                      :
                                                         :
AND                                                      :
                                                         :
PRIMAL DEFENSE TRAINING, LLC                             :
2061 Auden Lane                                          :
Allentown, PA 18104                                      :
                                                         :
AND                                                      :
                                                         :
NATHAN MURR                                              :
113 North Liberty Street                                 :
Lititz, PA 17543                                         :
                                                         :
AND                                                      :
                                                         :
JOSHUA PRINCE                                            :
646 Lenape Road                                          :
Bechtelsville, PA 19505                                  :
                                                         :
AND                                                      :
                                                         :
PRINCE LAW OFFICES, P.C.                                 :
RD1, BOX 73                                              :
Bechtelsville, PA 19505                                  :
                                                         :
AND                                                      :
                                                         :
CIVIL RIGHTS DEFENSE FIRM, P.C.                          :
934 E. Hight Street                                      :
Pottstown, PA 19464                                      :
                                                         :
AND                                                      :

```
                                        :
TKD Properties, LLC                     :
1411 Chipperfield Drive                 :
Stroudsburg, PA 18360                   :
                                        :
                                        :
                    Defendants          :
```

## SECOND AMENDED COMPLAINT IN CIVIL ACTION

AND NOW COME Plaintiffs, Darin, Sean, and Tiffany McMahon, by and through their undersigned counsel, Cary B. McClain, Esq. and Robert M. Abernethy, Esq. of the McClain Firm, hereby submit this Second Amended Complaint, and in support thereof, aver as follows:

## THE PARTIES

1. Plaintiffs Darin McMahon (hereinafter referred to as "Plaintiff" and or "Darin McMahon") and Tiffany McMahon (hereinafter referred to as "Tiffany McMahon") are husband and wife adult individuals and citizens of the State of Delaware residing at 16042 Fox Cub Circle, Milton, DE 19968. Plaintiffs are citizens of the State of Delaware for the purposes of diversity jurisdiction.

2. Plaintiff Sean McMahon is an adult individual and citizen of the State of Delaware residing at 22190 Jefferson Road, Lincoln, DE 19960. Plaintiff is a citizen of the State of Delaware for the purposes of diversity jurisdiction.

3. Rockwell Tactical Group, LLC. (hereinafter referred to as "RTG") is a business entity duly organized and existing pursuant to the laws of the Commonwealth of Pennsylvania with a corporate headquarters located at 1151 Beaver Valley Pike, Lancaster, PA 17602, Lancaster County, Third Circuit, Eastern District of Pennsylvania, and its principal place of business located at 1685 Baltimore Pike, Gettysburg, PA 17325, and at all times material herein owned, possessed, maintained and controlled, by and through its duly authorized agents,

servants, workmen or employees a tactical defense and safety training operations and services

the particulars of which are described below. On information and belief, as stated below, Jared

Ross, a citizen of the Commonwealth of Pennsylvania, is the owner, operator, and principal of

RTG. Defendant RTG is a citizen of the Commonwealth of Pennsylvania for the purposes of

diversity jurisdiction.

      4.     Threat Assessment and Tactical Solutions Group, LLC (hereinafter referred to as

"TATS") is a business entity duly organized and existing pursuant to the laws of the

Commonwealth of Pennsylvania with a corporate headquarters and principal place of business

located at 103 Kraemer Avenue, Stroudsburg, PA 18360, and at all times material herein owned,

possessed, maintained and controlled, by and through its duly authorized agents, servants,

workmen or employees a reality based training simulated force-on-force scenario tactical

training facility (hereinafter referred to as "TATS" and/or the "shoothouse"), the particulars of

which are described below. On information and belief, Defendant Brandon Kehr, a citizen of the

Commonwealth of Pennsylvania, is the owner, operator, and principle of Defendant TATS.

Defendant TATS is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity

jurisdiction.

      5.     Cody Saylor (hereinafter referred to as "Saylor" or "Defendant Saylor") is an

adult individual and citizen of the Commonwealth of Pennsylvania residing at 2033

Pennsylvania Avenue, Allentown, PA 18109, Lehigh County, Third Circuit, Eastern District of

Pennsylvania and  at all times material hereto, the Defendant acted or failed to act as an agent,

servant, workman and/or employee who was then and there acting within the scope of his

authority and course of his employment with Defendant RTG, TATS and Primal Defense

Training, LLC, on behalf and in furtherance of the business of Defendant RTG, TATS

TKD and/or Primal Defense Training, LLC. Defendant Saylor is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

6.      Primal Defense Training, LLC. (hereinafter may be referred to as "Primal") is a business entity duly organized and existing pursuant to the laws of the Commonwealth of Pennsylvania with a corporate headquarters and principal place of business located at 2061 Auden Lane, Allentown, PA 18104, Lehigh County, Third Circuit, Eastern District of Pennsylvania and at all times material herein was owned, operated, maintained and controlled by and through its duly authorized agents, servants, workmen or employees and Defendant Saylor, conducting business as a firearms instructor in the Commonwealth of Pennsylvania. On information and belief, Defendant Saylor, a citizen of the Commonwealth of Pennsylvania, is the owner, operator, and principle of Primal. Defendant Primal is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

7.      Nathan Murr (hereinafter referred to as "Defendant Murr" or "Murr") is an adult individual residing at 113 North Liberty Street, Lititz, PA 17543, Lancaster County, Third Circuit, Eastern District of Pennsylvania, and  at all times material hereto, the Defendant acted or failed to act as an agent, servant, workman and/or employee who was then and there acting within the scope of his authority and course of his employment with Defendant RTG and TATS on behalf and in furtherance of the business of Defendant RTG, Prince Law and Civil Rights Law, Primal, TKD and TATS. Defendant Murr is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

9.      Joshua Prince (hereinafter referred to as "Defendant Prince" or "Prince") is an adult individual residing at 646 Lenape Road, Bechtelsville, PA 19505, Montgomery County, Third Circuit, Eastern District of Pennsylvania, and at all times material hereto, the Defendant

acted or failed to act as an agent, servant, workman and/or employee who was then and there

acting within the scope of his authority and course of his employment with Defendant RTG,

Prince Law Offices, PC, and/or Civil Rights Defense Firm, PC, on behalf and in furtherance of

the business of Defendant RTG, TATS, Prince Law Offices, PC, Civil Rights Defense Firm, PC,

Primal Defense Training LLC and TKD. Defendant Prince is a citizen of the Commonwealth of

Pennsylvania for the purposes of diversity jurisdiction.

10.     Prince Law Offices, PC (hereinafter may be referred to as Prince Law) is a

business entity duly organized and existing pursuant to the laws of the Commonwealth of

Pennsylvania with a corporate headquarters and principal place of business at RD1, Box 73,

Bechtelsville PA 19505, Montgomery County, Third Circuit, Eastern District of Pennsylvania,

and at all times material hereto was owned, operated, maintained and controlled by and through

its duly authorized agents, servants, workmen or employees and Joshua Prince, which engages in

the business of conducting legal work and firearms education. On information and belief Warren

Prince, a citizen of the Commonwealth of Pennsylvania residing at 646 Lenape Road,

Bechtelsville, PA 19505, is the owner, operator, and president of Prince Law. Defendant Prince

Law is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

A copy of the corporation search results from the Pennsylvania Department of State is attached

hereto as Exhibit "BB".

11.     Civil Rights Defense Firm, P.C. (hereinafter referred to as "Civil Rights Law" is a

business entity duly organized and existing pursuant to the laws of the Commonwealth of

Pennsylvania with a corporate headquarters and principal place of business 934 High Street,

Pottstown, PA 19464, Montgomery County, Third Circuit, Eastern District of Pennsylvania,

(which is a division of Prince Law Offices, PC) and own the fictitious name Firearms Industry

Consulting Group (which is a division of Civil Rights Defense Firm, PC) and at all times material hereto was owned, operated, maintained and controlled by and through its duly authorized agents, servants, workmen or employees and Joshua Prince, conducting legal work and firearms education. On information and belief Defendant Joshua Prince, a citizen of the Commonwealth of Pennsylvania, is the owner, operator, and principle of Defendant Civil Rights Law. Defendant Civil Rights Law is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

12.     Jared Ross (hereinafter referred to as "Defendant Ross" or "Ross") is an adult individual residing at 234 Springview Road, Carlisle, PA 17015 and  at all times material hereto, the Defendant, with Army experience, is the owner, operator, principal of RTG and acted or failed to act as the owner and an agent, servant, workman and/or employee who was then and there acting within the scope of his authority and course of his employment with Defendant RTG and TATS, on behalf and in furtherance of the business of Defendant RTG, TATS, Primal Defense Training LLC, Prince Law Offices, PC, Civil Rights Law and TKD. Defendant Ross is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

13.     Brandon Kehr (hereinafter referred to as "Defendant Kehr" and "Kehr") is an adult individual residing at 125 Elizabeth Street, Apartment A, East Stroudsburg, PA 18301 and at all times material hereto, the Defendant, a former Marine, is the owner, operator, principal of TATS and acted or failed to act as the owner and an agent, servant, workman and/or employee who was then and there acting within the scope of his authority and course of his employment with Defendant TATS and RTG, on behalf and in furtherance of the business of Defendant TATS, RTG, Primal Defense Training LLC, Prince Law Offices, PC, Civil Rights Law and/or

TKD. Defendant Kehr is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

14.     TKD Properties, LLC (hereinafter may be referred to as "TKD") is a business entity duly organized and existing pursuant to the laws of the Commonwealth of Pennsylvania with a corporate headquarters and principle place of business located at 1411 Chipperfield Drive, Stroudsburg, Monroe County, PA and at all times material hereto owned the property located at 103-105 Kramer Avenue, Stroudsburg, PA 18360 where the incident at TATS occurred and is hereinafter described and permitted all Defendants to conduct business with the building and on the property that encompasses this incident and damages described below. Defendant TKD is a citizen of the Commonwealth of Pennsylvania for the purposes of diversity jurisdiction.

15.     At all times material herein, all Defendants were acting in their individual capacity and/or as agents, servants, sub-contractors and/or employees of each other and or each other's companies, acting to further the business, economic and financial interests of each other and/or each other's company business, and are liable for the negligent acts and omissions of individual Defendants and/or their companies, under theories of vicarious liability, agency, master-servant, respondeat superior, and right of control.

## JURISDICTION AND VENUE

16.     Plaintiffs incorporate paragraphs 1-15 of the Complaint by reference herein, as though same were set forth at length.

17.     Based upon the domicile of each of the parties, there exists complete diversity of citizenship between the parties, as they are citizens of different states. As stated above, all Plaintiffs are citizens of the state of Delaware, and all Defendants are citizens of the Commonwealth of Pennsylvania.

18.     On September 22, 2019, Medical doctor and general trauma surgeon at Lehigh Hospital, Dr. Joseph J. Stirparo, M.D., diagnosed Plaintiff Darin McMahon as a "quadriplegic C5-C7 complete" stating that the date of "commencement of condition" was September 15, 2019 as a result of the injuries suffered in this accident as more fully described below. See medical report attached as Exhibit "R".  Therefore, it is alleged that the amount in controversy exceeds seventy-five thousand ($75,000) dollars. Further, based upon a preliminary life care plan prepared by BalaCare Solutions outlining the future cost of care for Plaintiff Darin McMahon, who is now a quadriplegic, at approximately Eight million one hundred sixty-seven thousand and ninety-one dollars ($8,167,091.00). The medical lien continues to rise and is over $1million at this point. Lastly, forensic economist Andrew C. Verzilli, MBA prepared a preliminary estimate of a loss of earning capacity at two million seven hundred and twenty-three thousand seven hundred and six dollars ($2,723,706.00) to two million nine hundred ninety-nine thousand four hundred and thirty-six dollars ($2,999,436.00). Therefore, the amount in controversy exceeds seventy-five thousand ($75,000.00) dollars.  A copy of the life care plan is attached hereto as Exhibit "R2". A copy of the preliminary loss of earning capacity report is attached hereto as Exhibit "R3".

19.     The United States District Court for the Eastern District of Pennsylvania has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), as this is a civil action between citizens of different states with an amount in controversy in excess of $75,000.00.

20.     Venue lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(b)(1) in that all Defendants are citizens of Pennsylvania and RTG, Saylor, Primal, Murr, True North Concepts, LLC, Prince, Prince Law Offices, P.C. and Civil Rights Defense Firm,

P.C. are citizens of the Eastern District of Pennsylvania, reside in the district, and regularly conduct business in the district.

<u>FACTS</u>

**A.    Background Facts**

21.    Plaintiffs incorporate paragraphs 1-20 of the Complaint by reference herein, as though same were set forth at length.

22.    RTG is a training company based in Central Pennsylvania that, per its website, "teaches all levels of weapons training" established in late 2010 by Defendant Ross, who has a background as an Army Green Beret, the company's founder and owner, Ross has been in charge of the day-to-day business operations of RTG full time since 2012. A copy of the "About Us" section of the company's website is attached hereto as Exhibit "A".

23.    Pursuant to the company's website, RTG holds classes throughout the year for its membership, including, but not limited to, seminars, live training and demonstrations on multiple firearms platforms, medical classes, and situational combat training simulations and exercises. A copy of the "Training" section of the company's website is attached hereto as Exhibit "B".

24.    RTG states that they "have some of the most qualified, knowledgeable and well-respected trainers in the country who have used their skills throughout their military and law enforcement careers." See Exhibit "A".

25.    RTG goes on to state that the foundation of everything they teach is the "Rockwell mindset," because "[i]n any situation, the gun is simply the tool. Your mind is the real weapon. And, having the proper mindset can be the difference between failure and success." <u>Id.</u>

26.    TATS is a reality-based firearms and defensive measures training company that "provides training to prepare law enforcement officers, armed professionals and responsible

citizens to survive imminent, real world threats." A copy of the "About TATS" section of the company's website is attached hereto as Exhibit "C".

27.    TATS also makes their "shoothouse", a 3,500+ square foot 360 degree complex featuring nearly 20 rooms containing both residential and office spaces replete with vehicles in their simulated garage, available to rent out for a variety of functions and events, and their staff assists renters in "creating an event like no other." A copy of the "Venue Rental" section of the company's website is attached hereto as Exhibit "D". A layout of the shoothouse is attached hereto as Exhibit "E".

28.    On information received, the reality-based training related to this incident, allowed each individual defendant and their respective companies to further the business goals and advertising of each individual and/or their business.

29.    Ultimately, "[e]verything offered at TATS is motivated by gun safety, awareness and fun." See Exhibit "C".

30.    On Monday, September 16, 2019, BRC News 13, a television news agency, interviewed Brandon Kehr and Channel 13 News correspondent Nicole Walters reported in her interview that, "TATS says there's a safety protocol in place to not allow real weapons in the real time shooting scenario. First, they have a separate room where people are directed to store their real weapons in a locker." Kehr encourages participants and instructors to bring live weapons with live ammunition into the TATS building facility shoothouse. See Exhibit "F" – Channel 13 News Interview 9.16.19.

31.    TATS' website depicts photos of real firearms such as Glock, Sig Sauer, and Smith & Wesson handguns, as well as AR-15 rifles that are chambered to shoot non-lethal paint

or chalk marking rounds of ammunition. A copy of the "Our Guns" section of the TATS website is attached hereto as Exhibit "G"

32.     On the RTG website, there is a class description for RBT (Reality Based Training called "RBT Dynamic Force on Force 102", and RTG states, "The day will be spent with live role players using UTM guns. Safety gear will be provided, and you should bring your normal EDC set up. If you don't have a holster or mag pouches that will accommodate Glock 17, loaners will be available." A copy of the "Force-on-Force" section of the RTG website is attached hereto as Exhibit "H".

33.     On an episode of "Concealed Carry Gunfighter", from the Captain Berz YouTube Channel, Defendant Murr, a former Marine who holds himself out as an instructor and "gunfighter" while promoting his firearms accessories, talks about his experience as an instructor and he admits that "I'm not that qualified, I learned mostly from citizens and not military." He admits to having recurring dreams wherein he shoots a "scumbag" in the head at point blank range because the scumbag stole his dog. A screenshot of the YouTube interview is attached hereto as Exhibit "K".

34.     On PrinceLaw.com, the website for Prince Law Offices, P.C., in an effort to attract potential legal clients, Defendant Prince touts his "Honors and Awards" – detailing his Gun Instructor licenses and certifications including: (1) National Rifle Association (hereinafter "NRA") Certified Chief Range Safety Officer, (2) NRA Certified Basic Pistol Instructor, (3) NRA Certified Personal Protection in the Home Instructor, and (4) NRA Certified Home Firearm Safety Instructor. A copy of the "Honors and Awards" section of Defendant Prince's website bio is attached hereto as Exhibit "L". On September 15, 2019, Prince embedded himself in the RBT in an effort to bolster his resume as a shooting instructor and to present legal advice in an effort

to attract potential clients teaching participant customers as a range instructor and lawyer giving advice on when it is acceptable to defend yourself with justifiable deadly force utilizing a weapon.

35.     Defendant Saylor advertises his shooting prowess on the internet depicting himself in the water bottle challenge shooting the top off of a water bottle with a pistol. In another advertisement on his Facebook page, he drops to his back and fires a weapon between his legs at the camera. As stated above, he holds himself out to the public as a firearms instructor through his company Primal Defense Training. Photos of Saylor's shooting advertisements are attached hereto as Exhibit "M".

36.     On the Primal Defense Training Facebook page, Cody Saylor states, "Message me to book your first private lesson…Primal Defense Training offers private firearms lessons…Get 1 on 1 attention at your own learning pace…. I have 7 years and well over 300 hours of dedicated training experience and counting…From beginners to experienced, you will learn to use and apply firearm as a tool for self-defense." A copy of the Primal Defense Training Facebook advertisement is attached hereto as Exhibit "N".

37.     On the Primal Defense Training Facebook page, Cody Saylor states, "So this is my little project called @primaldefensetraining. I formed this strictly to do private lessons and maybe some other small ventures and go from there…Times aren't looking so comfortable anymore, maybe it's time for you to get to work. Learn to shoot, learn to fight." A copy of the Primal Defense Training Facebook post, dated August 20, 2019, is attached hereto as Exhibit "O".

38.     Ultimate Training Munitions, Inc. (hereinafter may be referred to as "UTM" and at all times material herein was the manufacturer of conversion kits created to allow real firearms

to shoot paint-filled "man marking rounds" and said conversion kits were utilized by RTG in their force-on-force training, the particulars of which are described herein.

39.     The less-lethal versions of these firearms are typically identified by brightly colored markings on the chamber, handgrip, ammunition clip, and/or barrel of the weapon. In order to fire the UTM man-marking rounds, live round firearms are converted using a special slide, chamber, and spring mechanism that is designed specifically to "lock out" live rounds as a safety feature. See Exhibit "G". See also a copy of the "Firearms Conversion" section of Ultimate Training Munition's website, attached hereto as Exhibit "I".

40.     The slide contained in UTM's conversion kit contains blue markings on the side to distinguish it from the slide of a real firearm. However, when contained in a holster, the blue markings are not visible to the naked eye, whereas there are modified gun companies that produce an all blue or all pink gun so that it can be distinguished as a modified less than lethal munition. See Exhibit "I".

**B.     Safety Principles and Procedures**

41.     The UTM safety guidelines state that there should always be a "Primary Safety Controller" who should initially "inspect the training area and require all participants on site to double check and confirm there are no "live" duty weapons, "live" back-up weapons, "live" ammunitions, edged weapons, live chemical spray or duty impact weapons in the training area". The guidelines go on to state that the Primary Safety Controller should enforce the "Buddy Check" and "Check Twice" systems, and that "[i]t is the responsibility of every Role Player and Aggressor involved in the training scenarios to be familiar with the weapon system being used, wear protective safety equipment, safety clothing and adhere to all safety requirements". Prior to the shooting incident which ultimately injured Plaintiff Darin McMahon, none of the

aforementioned safety procedures were followed. In fact, as stated Kehr had made it clear that everyone should bring their live weapons with live rounds into the facility for safekeeping. A copy of the UTM safety guidelines is attached hereto as Exhibit "J".

42.     UTM makes it clear that "UTM's Man-Marking cartridges are designed for professionals. UTM's products are intended only for use in supervised law enforcement and military training conducted in accordance with UTM's guidelines for use and safety recommendations." On September 15, 2019, the reality-based training was not for law enforcement or military training and instead participants were non-military and non-law enforcement. See Exhibit "J".

43.     Plaintiff firearms expert Emanuel Kapelsohn is the 3rd Vice President of The International Association of Law Enforcement Firearms Instructors, Inc. (hereinafter referred to as "IALEFI") and the Principal Author of the IALEFI Guidelines for Simulation Training Safety (hereinafter the "Guidelines").

44.     IALEFI is a membership organization which was organized in 1981, and its Guidelines were created in an effort to solve the "invariably avoidable training deaths and injuries that occur simulation firearms training courses.

45.     According to the Guidelines, the main causes of firearms training deaths and/or injuries are: (1) the presence of live ammunition in the training area, (2) the use of functional firearms as training props, (3) failure to follow proper safety procedures to prevent accidents from occurring, and (4) conducting of simulation exercises by instructors who have not themselves received any instruction in how to conduct this type of properly.

46.     The Guidelines cite to twenty-five (25) examples of deaths and/or bodily injuries caused by failures to follow protocol and introduce live ammunition into the training area.

47.     The Guidelines outline Safety Principles for Simulation Training, which are considered "basic safety principles" that can "significantly improve the safety of simulation training exercises".

48.     The first principle of the Guidelines is 'No live ammunition is allowed in the training area', which states, in pertinent part, "There must be no live ammunition inside the secured perimeter of the training site . . . [l]ive ammunition and functional weapons can be locked in the trainees' vehicles outside the secured training area, secured in an armory, or locked in a container under the control of the Instructor or Safety Officer and which can only be opened by these officials . . . [t]rainees should never be allowed to obtain and load supposed training munitions themselves, without direct supervision and control by the Instructor or designated Safety Officer."

49.     The second principle of the Guidelines is 'When possible – don't use functional firearms as training props', which states, in pertinent part, "If working firearms are used to fire marking cartridges, blanks, primer rounds, etc., then extra emphasis should be placed on other safety precautions to better manage the increased risk which the use of functional weapons entails . . . [s]eeing any weapon in the training area which is not marked, taped, tagged, or with a barrel insert installed MUST result in an immediate "STOP ACTION" being called."

50.     Further, the Guidelines state " . . . using functional firearms sends a "mixed message" to trainees by violating one of the Cardinal Rules of Firearms Safety, that one should 'Treat All Guns As Loaded'."

51.     The third principle, 'Establish a secured training area', states, in pertinent part, "Doors to training rooms should be locked, posted with signs, and/or continuously guarded by Safety Officers."

52.     The fourth, and perhaps most relevant, safety principle is 'Use the triple-check safety rule', which states, in pertinent part, "The first check must be conducted by the trainee himself . . . [t]he second check must be conducted by a training "partner" or fellow student . . . [f]inally, a third check must be performed by a Safety Officer or the Instructor . . . [d]uring the triple check, it should be confirmed that the individual has the proper safety equipment . . . authorized simulator training weapons and training munitions are generally issued to the participants during or after the third check . . . no one is allowed to have unauthorized, functional weapons or live ammunition – not even the Instructor(s) – and no one is allowed to enter the training area without being Triple-Checked . . . REMEMBER, several tragedies have occurred because the Instructor's own weapon had not been checked!"

53.     The Guidelines further discuss the importance of designating at least one Safety Officer (separate and apart from the Instructor and not a role player) for each training scenario in progress, as well as obtaining or conducting formal instructor training in the methods and procedures that will allow such training to be conducted effectively.

54.     The defendants did not follow accepted safety guidelines which said failure was the direct reason for the shooting of McMahon with real ammunition and said failure is gross negligence and recklessness.

C.      **Facts Surrounding the Shooting Incident**

55.     On information received, on Sunday, September 15, 2019, Plaintiff Darin McMahon entered the TATS "shoothouse" facility to participate in situational, reality-based firearms training "RBT" simulations for the second day of a recreational, weekend-long trip.

56.     Channel 13 news outlet spoke with the Stroud Area Regional Police Department who confirmed that RTG rented the facility from TATS.

57.     Jared Ross was not present for the weekend at TATS, but allowed TATS, Murr, Prince, Saylor, Kehr and the customers including Darin McMahon to use his UTM guns for training.

58.     On information and belief Ross hired, retained and failed to supervise TATS, Murr, Prince, Kehr and Saylor and the work of the other defendant entities.

59.     On information and belief, and as seen on customer videos and social media posts, RTG has performed dangerous training activities on occasion prior to the September 15, 2019 incident and the owner of TATS, Defendant Kehr was aware of RTG's practices.

60.     In an article written for the Pocono Record on September 16, 2019, Kehr stated "We are familiar with the company that was in here," Kehr said, "We've dealt with them several times, a handful of times. They're very stand up guys; they're very good at what they do. It's just unfortunate that this incident happened. It's a shame." A copy of the September 16, 2019 Pocono Record article is attached hereto as Exhibit "P".

61.     In numerous dangerous incidents wherein safe shooting practices, protocols and procedures were not followed, an RTG instructor directed customers at a shooting range to shoot down range between the heads of other customers with live rounds as they walked across and behind the other customers. Defendant Saylor was an instructor wherein he assisted, learned from and demonstrated for the lead instructor in some of these dangerous incidents.

62.     In another incident, an RTG instructor was asked on social media by Dame Michael, "Do you carry a real BUG [real gun with real ammunition] for simulation training? RTG instructor Garry Marr answered, "My mindset says not to let someone disarm you. I've carried guns through metal detectors, snuck them into federal prison and courthouses. I'm surely

not letting the dude in the fancy red hat with scrambled eggs on the bill do it." A copy of the exchange is attached hereto as Exhibit "Q".

63.     On information and belief, the weekend of Saturday September 14 and Sunday September 15 at the TATS shoothouse, RTG, TATS and the individual instructors were conducting RBT training simulations that were separated into two sessions, one in the morning and one in the afternoon with a break for lunch in between.

64.     On information and belief, Kehr was present on Saturday and Sunday mornings at the TATS shoothouse assisting as the host. Consistent with his post-incident interview with the news media, Kehr told the customer group and instructors that the parking lot area was shady and that they should bring their personal live weapons out of their cars and bring them into the facility. Lockers were provided in the facility, but they were not locked. Some of the customers and instructors brought live weapons into the facility per Kehr's instruction. Kehr sold TATS merchandise to the customers and opened his facilities including the bathrooms and situational force-on-force scenario rooms to all customers. Kehr offered TATS safety gear to the customers as well.

65.     On information received, the aggressor role players instructors during this incident hereinafter described were shooting range instructors Josh Prince from Civil Rights Defense Firm and Cody Saylor from Primal. This was confirmed by Cody Saylor in his statement to the police and by Nathan Murr in his limited deposition in this matter.

66.     On information and belief, prior to entering the situational training area of the facility, each customer was supposed to be frisked, but a standard frisk procedure was not performed, participants did not observe each pat down each time and the pattern of safety procedure was allowed to be interrupted and skewed.

67.     On information and belief, none of the defendants had any personnel or security present to ensure that no live-round firearms entered the "shoothouse" and/or the training area, nor did TATS have any security measures in place, such as a door-frame metal detector. While TATS has handheld electronic metal-detecting wands available at the "shoothouse", they were not required to be utilized. Further, because the UTMs are real metal handguns, a detecting wand is futile unless used safely according to proper safety policies, procedures and protocols.

68.     While TATS utilized video to record scenarios for customers and instructors to view after each scenario session, TATS did not utilize surveillance cameras to observe or record if customers or attendees entered with live weapons. On information and belief, Kehr operated the recording device.

69.     On information and belief, the defendants, including TATS, RTG, Kehr, Murr, Saylor and Prince, did not frisk customer attendees appropriately nor were metal detector wands utilized.

70.     On information and belief, Sunday, September 15, 2019, the group of customers left the TATS facility after the morning session for a lunch break and returned to the TATS facility for their afternoon session.

71.     On information and belief, after lunch and upon return to TATS, Prince gave legal advice to all, stating that if the police ever want to speak to you because you were involved in a self-defense justification shooting, you should tell the police you are having heart palpitations and you need an ambulance so that the police cannot get a statement.

72.     On information and belief, Darin McMahon needed to leave early due to a family commitment and Murr told the group that he would try to squeeze in as many scenarios as possible in the time provided.

73.     On information and belief, Murr apprised the group that he is in the business of selling accessories for firearms and promoted True North Concepts, LLC.

74.     On information and belief, in direct violation of known safety standards, none of the instructors or customers were frisked for live weapons, nor was a metal detector utilized, prior to entering the TATS facility, staging area, lecture area or shoothouse situational training area of the facility at the start of the September 15, 2019 afternoon session.

75.     On information and belief, instructor role players Cody Saylor and Josh Prince did not frisk each other on September 15, 2019 just prior to the incident despite being instructor role players in the shoothouse awaiting Plaintiff's entry for the force-on-force scenario. Murr and Kehr did not frisk Saylor or Prince.

76.     On information and belief, on September 15, 2019, the plan for the afternoon session was a car situation scenario in which, one by one, and accompanied by the instructor Defendant Murr, each participant would enter the shoothouse and react to the force on force scenario as aggressor role players Defendant Saylor and Defendant Prince awaited the entry of the customer. Murr was acting only as an observing instructor and was not a shooter. The two instructor role players Prince and Saylor and customer Darin McMahon were supposed to be equipped with UTM guns. Cody Saylor entered the facility, staging area and the shoothouse as an instructor role player with a live weapon with live bullets because he forgot to "switch out" his real live gun and ammo for a UTM with non-lethal marking rounds and because he was not frisked by Murr or Prince.

77.     On information and belief, prior to entering the shoothouse scenario Plaintiff Darin McMahon was supplied a UTM gun. Darin McMahon was the first participant, and he was

instructed by Murr to enter the shoothouse and react to the situation. Murr followed Darin McMahon as an observer and was not a role player firing a UTM weapon.

78.     On information and belief, in the ensuing scenario, Plaintiff Darin McMahon was shot by Cody Saylor in the neck area in the presence of instructors Murr and Prince. Customers Sean McMahon, Jon Roder and Ted Dabbs were only a few feet away when they heard paint round UTM ammunition being fired. Suddenly, they heard one louder, live round sounding "bang" of live weapon fire and rushing to Darin McMahon's aid observed the bloody aftermath just seconds later.

79.     Medical safety kits were not available in each room, and said kits were not carried by instructors. Instructors did not have the licenses, training or certifications for lifesaving, CPR and medical treatment.

80.     On information and belief, on September 15, 2019, Plaintiff Darin McMahon was flown to Lehigh Valley Hospital via helicopter. An x-ray of Darin McMahon's head and cervical spine reveals a live 9mm round tore into Darin McMahon's neck, lodging in the C-6 spinal cord, leaving Darin a quadriplegic, which has caused him to lose functioning and feeling below his neck. A copy of the Certification of Healthcare Provider for Family Member's Serious Health Condition is attached hereto as Exhibit "R". A copy of the X-Ray depicting the bullet lodged in Darin McMahon's spinal cord is attached hereto as Exhibit "S".

81.     On information and belief, Prince and Plaintiff Darin McMahon were utilizing UTM guns, but Cody Saylor's 9mm Glock with live ammunition was found in the shooting area near the almost fatal car scenario incident proving that Saylor shot Plaintiff Darin McMahon.

82.     On information and belief, Saylor told the police he was having heart palpitations and that he needed to go the hospital and he refused to talk about the incident.

83.     On information and belief, Prince told the police that he represented Murr and Saylor and that Murr and Saylor would remain silent with regard to the incident.

84.     All defendants, including TATS training facility, instructor Kehr, RTG, instructor Murr, and instructor-role players Saylor and lawyer Prince failed to create the safe and professional training environment McMahon and the other participant customers had ample reason to believe it would be, and they did not follow accepted safety protocols, procedures and policies.

85.     Defendant Saylor is represented by Eric Winter, Esquire of Prince Law Offices and he agreed to be interviewed by police on September 23, 2019, wherein he admitted that he was not frisked by Murr or Prince and that he carried his real gun with real ammunition into the RBT scenario, shooting the victim, Plaintiff Darin McMahon, in the neck with his 9mm handgun causing the injuries.

86.     Defendant Saylor was a subcontractor of RTG and working to further RTG business and also as a Primal Defense instructor. Some of Saylor's prior work history with RTG involved acting as a role player in their training courses in exchange for "comping" the attendance fee for Defendant Saylor at other firearms training courses offered by RTG. Clearly, Saylor was acting on behalf of RTG and/or an independent contractor for RTG with Primal Defense.

87.     When questioned further about his relationship with Defendant RTG, Saylor approximated that he participated with RTG four to five times per year for two years, and stated, "we are always advised to carry our firearms with us to lunch because we are out in the real world and they want to make sure we are safe."

88.     When discussing the protocol before a simulation training begins, Defendant Saylor stated "we usually do pat downs . . . I remember protocol was followed on Saturday . . . I don't recall them doing the pat down [on Sunday]."

89.     Saylor further stated that he conceals his gun in an "appendix" style holster, both when carrying his functional firearm on a daily basis and while role playing with a simunition firearm, and to draw his firearm he has to pull up his shirt or sweatshirt. A simunition is a gun with man marking rounds and it is used in RBT because it does not have live ammunition. It is a simulated munition or "simunition". A man marking round is a round that is meant to leave a mark on anything it hits, but it is not a real live bullet.

90.     According to Saylor, neither TATS nor RTG has a procedure in place in which the simunition guns need to be signed in and out, and that, on Sunday after lunch, he arrived back at the TATS facility around the same time everyone else and he did not return to the locker he stored his functional firearm in on Sunday morning.

91.     In fact, surveillance footage from the TATS facility reveals that Defendants Saylor and Prince both utilized a separate "office" room to store their gear, reload their firearms, and prepare for the upcoming scenarios.[1]

92.     Saylor can be seen on surveillance video utilizing his own "office" area to secure his UTM and holster, rushing around between rooms before scenarios, Saylor and Prince use Saylor's office to store man marking rounds, Saylor and Prince use the Saylor office to load their UTMs and Saylor does not secure his UTM in the armory. Saylor is continually rushing around, coming and going from the office as he at times forgets his gloves, sweatshirt, hat, mask etc.

---

[1] While it is unclear exactly where the "office" room is located within the TATS facility, it is clear that this was a room separate and away from the "briefing" room that was located outside of the training area, where, according to Saylor's statement to police, trainees were subject to pat downs on Saturday.

Saylor has a blue gun in his bag on the office table and he switches the UTM and the blue gun out of multiple holsters contained in the bag. Saylor takes man marking rounds and  puts them in this pocket, then he returns to scenarios.

93.     Participants and trainers were permitted to perform "head shots" (shooting man marking rounds at the head of another shooter). Prince is seen wiping blood from a man marking wound to his forehead. Prince can be seen on video talking to participants and instructing them on second amendment law, justification and shooting instruction.

94.     Since the incident, TATS has made several changes to their business and safety procedures, including, but not limited to, installing a walk-through metal detector just as shooters walk into the front door entrance to the business and moving the gun lockers to the entrance where the metal detector stands.

95.     A video of the scenario depicting Cody Saylor shooting Plaintiff McMahon causing the injuries was secured by the Stroud Area Regional Police Department. Said video shows Saylor shoot McMahon on Sunday, September 15, 2019 with a real weapon with real ammunition.

96.     On Tuesday, September 17, 2019, Defendant Ross stated in a social media video, approximately 1 minute and 9 seconds in length, posted to Facebook and YouTube, that "a horrible accident occurred at one of our training facilities. . . clearly our standing and written safety protocols were not followed." A screenshot of the video statement is attached hereto as Exhibit "T".

97.     RTG also posted a written statement on their website stating, "On Sunday September 15, an unfortunate incident occurred during one of our classes. RTG had rented the facility from Threat Assessment and Tactical Solutions Group, LLC. A participant was injured

and hospitalized. . . [a]s a consequence, for the time being RTG will not be adding anymore class dates. We will still honor and hold the existing classes on the schedule. They will be run by Jared, personally." A copy of the statement posted to RTG's website is attached hereto as Exhibit "U".

98.     In an interview with a news outlet Kehr stated, "his company is currently considering future rentals and regulations for the use of the facility. This could include establishing Threat Assessment and Tactical Solutions as "safety officers" for third-party events, whereas previously, the company allowed those groups to operate relatively autonomously. "We're still trying to figure out what we want to do as far as welcoming third-party companies in here again," Kehr said. "If we choose that as a route that we want to go, then we are going to elevate the safety protocols that each company has to adhere to before they can even be considered." See Exhibit "P".

99.     In another news article, Kehr admits, "before anyone goes into the shooting zone a safety briefing is done and this includes a metal detecting wand." "In front of our students we wand the instructor and role players in front of the students as well as wanding the students." A copy of the Channel 69 news article published on September 17, 2019 is attached hereto as Exhibit "V".

100.    Channel 13 news correspondent Nicole Walters interviewed Kehr and on September 16, 2019 reported that TATS stated there is a protocol prior to entering the scenario where, "TATS has a safety protocol in place to not allow real weapons in the real time shooting scenario….Then before anyone enters the scenario a metal detector wand is used to make sure no one has anything dangerous on them." She goes on to state that, "We are told that Rockwell

Tactical Group had its own safety protocols even though the wands were available to them." Screenshots of the news interview are attached hereto as Exhibit "W".

101.    According to the article, Kehr plans on changing the protocol to ensure that he has the final say on safety whether he is directly involved or not. Kehr stated, "Instead of being that facility that just opens its doors, it is going to have to be that overall safety monitor." See Exhibit "V".

102.    On September 16, Channel 13 news correspondents George Roberts and Marie Johns introduced a television production prepared by news reporter Nicole Walters wherein they published an audiovisual interview with Brandon Kehr wherein he admits, "We now know that if we want any other training organizations to come in and use our facility that we are now going to implement even harsher safety protocols that they have to abide by because our standards for safety were completely different than unfortunately what was utilized yesterday." A screenshot from the Channel 13 Interview on September 16, 2019 is attached hereto as Exhibit "X".

103.    In the same interview as above, Kehr states, "The training organization that was here yesterday, again it was unfortunate, but again they are a good group of guys. I do know them, they have been here several times before and have trained."

104.    In another news article, Stroud Area Regional Police Chief Jennifer Lyons stated, "I believe a crucial safety step was missed." In another article she stated, "The victim was shot with a real gun containing a live round of ammunition." A screenshot from the Channel 13 interview of Chief Lyons on September 16, 2019 is attached hereto as Exhibit "Y". See also Exhibit "V".

105.    On information and belief, RTG supplied UTM guns and paint marking rounds and protective masks, and TATS made other protective gear available for use including throat protectors. While TATS possessed metal detector wands, said equipment was not utilized.

106.    On information and belief, the TATS shoothouse contains upwards of 17 rooms, there was no requirement for participants and instructors to be frisked for real weapons and real rounds in a secure locked area prior to entering the shoothouse, nor was a second check for real weapons and real rounds conducted in a separate secure room where the UTMs and paint marking rounds were provided prior to entering the shoothouse.

107.    On information and belief, Stroud Area Regional Police Department issued search warrants on RTG and TATS to secure, among other things, the rules and regulations regarding safety policies, procedures and protocols.

108.    The TATS participant waiver states at paragraph number 5 that participants "assume the risk of non-lethal rounds causing injury." The waiver does not contemplate assuming the risk of lethal rounds being used in scenarios which is grossly negligent and reckless. A copy of the TATS participant waiver is attached hereto as Exhibit "Z".

109.    At paragraph 2, the TATS waiver states participants must follow "safety rules, range procedures, and directives, whether written or oral, of TATS." Yet, no rules are posted within the shoothouse and none were provided by any instructors to customers or instructors. Id.

110.    On the TATS website in the Code of Conduct section it is stated, "No live ammo, firearms, or knives in the training facility period." "Practice safe gun handling at all times." Of course, this Code was not followed as Kehr encouraged everyone to bring real guns and ammunition into the facility. A copy of the TATS Code of Conduct is attached hereto as Exhibit "AA".

111.     Despite knowing that Murr, Kehr, Prince and Saylor held themselves out as instructors, but were not adequately trained, qualified or certified to be instructors, Ross and RTG allowed the aforementioned to host the customers at the shoothouse and direct the days events in an unsafe manner as individuals, agents of RTG, agents of TATS and agents of their own companies.

112.     Despite knowing that Murr, Kehr, Prince and Saylor held themselves out as instructors, but were not adequately trained,  qualified or certified to be instructors, and knowing that Ross was not present, Kehr and the property owner TDK Properties allowed the aforementioned to host the customers at the shoothouse and direct the day's events in an unsafe manner as individuals, agents of TATS, agents of RTG and agents of their own companies.

**D.     Damages Facts**

113.     As a direct and proximate result of the Defendants' conduct described above, Plaintiff Darin McMahon sustained serious injuries to his body and limbs, including but not limited to, making him a quadriplegic with total loss of feeling and movement from the neck down, requiring life support, tracheotomy, ventilator and twenty-four hour care, which is permanent and has caused him to seek extensive medical treatment now and into the future to pay for future medical bills, care and equipment.

114.     As a result of the Defendants' conduct described above, Plaintiff Darin McMahon has been or will be obligated to receive and undergo medical attention and care and to expend various sums of money and to incur various expenses for treatment of the injuries he has suffered, and he may be obligated to continue to spend such sums and incur such expenses for an indefinite time into the future.

115.     As a further result of the Defendants' conduct, Plaintiff Darin McMahon has suffered past severe physical pain, mental anguish and humiliation and he will continue to suffer same for an indefinite time into the future.

116.     As a further result of the Defendants' conduct, Plaintiff Darin McMahon has or may hereafter incur other financial expenses or losses, and he may be obliged to continue to expend such sums or incur such expenditures for an indefinite time in the future, including, but not limited to, wage loss, loss of future earnings and lost business opportunities.

117.     As a further result of the Defendants' conduct, Plaintiff Darin McMahon has suffered a loss of life's pleasures and has been unable to pursue his normal daily activities and occupations all to his great detriment and harm and all of which he may suffer for an indefinite time into the future.

118.     The conduct of Defendants as set forth above constitutes such egregious, outrageous and reckless disregard or indifference to the safety of others and human life that an assessment of punitive damages is necessary and just.

## COUNT I – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Jared Ross

119.     Plaintiff Darin McMahon incorporates paragraphs 1-118 of the Complaint by reference herein, as though same were set forth at length.

120.     Plaintiff's injuries and damages were caused by the negligence, carelessness and recklessness of the Defendants conduct as described herein.

121.     As described more fully above, Defendant Ross scheduled the training at TATS and organized the instructors so he owed a duty to Plaintiff Darin McMahon to keep him out of

harm's way and to ensure that instructor-role player Cody Saylor did not use a real weapon during the force-on-force scenario training.

122.    Defendant Ross breached his duty to Plaintiff Darin McMahon by permitting Saylor, Kehr, Murr and Prince to engage in Reality Based Training force on force negligently, recklessly and carelessly, which caused serious injuries and damages to Plaintiff as described more fully above.

123.    Ross hired Murr as lead instructor, and partnered with TATS, TKD, Kehr, Prince Law defendants and Primal Defense to run the force on force training event knowing that none of the instructors were experienced at following acceptable safety guidelines for force on force with UTM's and knowing that this was not for law enforcement or military.

124.    Ross partnered with Prince, Civil Rights and Prince Law to instruct participants on the legal ramifications of using a weapon in self-defense scenarios. Prince gave legal advice and a legal presentation to the participants with regard to the second amendment, self-defense issues and the ramifications of using justifiable force with a deadly weapon, at the TATS facility with the permission of TATS and RTG.

125.    Ross partnered with Saylor and Primal Defense to use Saylor as an instructor at TATS. RTG is vicariously liable for the acts of TATS, Kehr, Murr, Prince and Saylor. Ross partnered with TATS to teach the training at his facility with the knowledge that TATS and Kehr did not enforce safety policies, protocols or procedures. Ross knew that TATS and Kehr allowed guns and live ammunition into the shoothouse, but Ross did not ensure safety protocols were followed which allowed Saylor into a scenario with live rounds.

126.    Ross knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (see paragraph 48 above).

127.    Ross knew that Murr, Prince, Saylor, Kehr and TKD, were not trained and certified with regard to the IALEFI guidelines and Ross failed to ensure their knowledge and to make sure safety guidelines were followed.

128.    Defendant Ross's breaching actions and failures to act, consisted of, *inter alia*:

(a) failing to follow proper safety regulations for training seminars;

(b) failing to have and to require and ensure that particular safety policies, procedures and protocols were followed;

(c) permitting or failing to prevent grossly negligent or otherwise tortious conduct with instrumentalities under Defendants' control;

(d) failing to ensure that real guns with real bullets were not used in the training seminar;

(e) failing to enforce rules, regulations, and safety policies, procedures and protocols requiring that real guns with real bullets are not used in the training course;

(f) allowing and permitting real guns with real bullets to be brought to the training course in the TATS facility;

(g) failing to utilize UTM safety guidelines;

(h) failing to train participants on UTM safety guidelines, including, but not limited to, failure to check twice and utilize the buddy system;

(i) allowing non-law enforcement and non-military participants to use UTM modified handguns and UTM Man-Marking rounds;

(j) utilizing instructors that were not properly licensed and certified in fundamental, appropriate UTM and firearm safety;

(k) utilizing instructors with a history of dangerous practices while training;

(l) utilizing instructors that were trained under dangerous practice conditions;

(m) failing to have a medical kit in the room wherein RBT was conducted;

(n) failing to have instructors trained, licensed and knowledgeable in appropriate safety, CPR and medical life-saving procedures;

(o) failing to have measures in place to contact emergency personnel immediately; and

(p) in other such ways as may be revealed through the normal course of discovery.

129.    As a direct result of Defendant Ross's actions and failures to act, Defendant Saylor entered the shoothouse equipped with a live handgun while acting out a live scenario, instructors Murr and Prince did not frisk him, and Kehr allowed live weapons into the building and Kehr did not ensure safety procedures were followed.

130.    As a direct result of Defendant Ross's actions and failures to act, Defendant Saylor shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

131.    As such, Defendant Ross is directly and vicariously liable for the negligent, careless and reckless conduct of all Defendants, as outlined in the allegations above.

132.    As a result of Defendant Ross's gross negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Jared Ross jointly and severally with the other defendants in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT II - NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Rockwell Tactical Group, LLC

133.    Plaintiff Darin McMahon incorporates paragraphs 1-132 of the Complaint by reference herein, as though same were set forth at length.

134.    At all relevant times hereto, Defendant RTG's owners, instructors and role players, including, but not limited to, Defendants Ross, Murr, Prince, Saylor and Kehr were acting within the scope of their employment as agents, servants, or employees or responsible subcontractors of Defendant RTG.

135.    At his deposition Murr admitted that he was invited to be the lead instructor for the weekend event at September 14 and 15 at the TATS shoothouse. Murr admitted that he was paid $600 by RTG to be the lead instructor and he handed out the TATS and RTG waivers. Murr admitted that Ross from RTG organized the TATS training at the TKD property and brought in Prince Law and Primal Defense.

136.    Cody Saylor stated that Murr was the lead instructor and that no one was frisked for real weapons and real ammunition after lunch and preceding the instant shooting incident.

137.    Murr admitted that he received force-on-force training in the military and yet he failed to follow safety procedures during the weekend at TATS and said failure permitted Saylor to enter the shoothouse with a real weapon carrying live ammunition and permitted him to participate in a force on force scenario with a live gun causing McMahon to be shot in the neck with a live round of ammunition.

138.    RTG partnered with Prince, Prince Law, Civil Rights Law, Saylor, Primal Defense, TKD, TATS, Murr and Kehr to run the force on force training event, and RTG knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

    (a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

    (b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

    (c) A secure training area was not established (*see* paragraph number 44 above); and

    (d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (see paragraph 48 above).

139.    RTG knew that Murr, Prince, Saylor, Kehr and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and RTG failed to ensure their knowledge and to make sure safety guidelines were followed.

140.    Defendant RTG is vicariously liable for the acts or omissions of their agents, servants, sub-contractors and employees, including, but not limited to, all Defendants as though Defendant RTG performed the acts or omissions itself.

141.    Defendants are the ostensible agents of Defendant RTG, as there was a holding out to the public that RTG and its employees were affiliated with one another, either as agents, servants, employees, or in a joint venture.

142.    As a direct and proximate result of the gross negligence, recklessness and carelessness and/or reckless disregard described above, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant RTG jointly and severally with the other defendants in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

### COUNT III – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Brandon Kehr

143.    Plaintiff Darin McMahon incorporates paragraphs 1-142 of the Complaint by reference herein, as though same were set forth at length.

144.    Plaintiff's injuries and damages were caused by the gross negligence, carelessness and recklessness of Defendant Kehr's conduct as described herein.

145.    As described more fully above, Defendant Kehr owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that instructor-role player Cody Saylor did not use a real weapon during the force-on-force scenario training and to ensure that safety procedures were utilized and followed.

146.     Kehr hosted the RTG event and profited from it. He invited participants and trainers to bring their live weapons and live ammunition into the shoothouse TATS business and TKD building. He provided lockers, but did not enforce safety procedures to get the weapons into the lockers and then to lock the lockers. Kehr knew that attendees and trainers were bringing live rounds and live ammunition into the building, but he did not have safety procedures in place, and he did not enforce safety procedures to ensure that live weapons and live ammunition did not make it into the force-on-force scenarios at his facility.

147.     The TATS facility does not have any posted safety warnings or procedures. The front door of the shoothouse says "Watch Your Step", but it does not say "Live Weapons and Ammunition Prohibited in the Building".

148.     Kehr knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, RTG, Prince and Saylor, and he did nothing to enforce safety guidelines even though he hosted the event, profited from it, he was present, coming and going, observing the training, interacting with customers, and he is in the business of force on force training, namely:

> (a) Live ammunition was permitted in the training area (*see* paragraph 44 above);
>
> (b) Functional firearms were allowed in the training area (*see* paragraph 45 above);
>
> (c) A secure training area was not established (*see* paragraph number 44 above); and
>
> (d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (see paragraph 48 above).

149.     Kehr knew that Murr, Prince, Saylor, Ross and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and Kehr failed to ensure their knowledge and to make sure safety guidelines were followed.

150.     Defendant breached his duty to Plaintiff Darin McMahon by engaging in Reality Based Training force on force negligently, recklessly and carelessly, which caused serious injuries and damages to Plaintiff as described more fully above.

151.     Defendant Kehr's breaching actions and failures to act, consisted of, *inter alia*:

(a) Failing to follow proper safety regulations for training seminars;

(b) Failing to have and to require and ensure that particular safety policies, procedures and protocols were followed;

(c) Permitting or failing to prevent grossly negligent or otherwise tortious conduct upon premises or with instrumentalities under Defendants' control, including allowing real live weapons into the building;

(d) Failing to ensure that real guns with real bullets were not used in any third-party training seminars;

(e) Failing to prohibit real guns with real bullet rounds from entering the building facility and/or failing to enforce rules, regulations, and safety policies, procedures and protocols requiring that real guns with real bullets do not enter the facility;

(f) Allowing and permitting real guns with real bullets in the TATS facility;

(g) Failing to utilize UTM safety guidelines;

(h) Failing to train participants on UTM safety guidelines, including, but not limited to, failure to check twice and utilize the buddy system;

(i) Allowing non-law enforcement and non-military participants to use UTM modified handguns and UTM Man-Marking rounds in the TATS facility;

(j) Failing to require a frisk procedure or utilize a metal detecting wand responsibly prior to anyone entering the TATS shoothouse;

(k) Failing to have a medical kit in the room wherein RBT was conducted;

(l) Failing to have an on-site employee, agent, or other representative trained, licensed and knowledgeable in appropriate safety, CPR and medical life-saving procedures at the TATS facility during the third-party training seminar;

(m) Failing to have measures in place to contact emergency personnel immediately; and

(n) In other such ways as may be revealed through the normal course of discovery.

152.    As a direct result of Defendant Kehr's actions and failures to act, Defendant Saylor shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

153.    As such, Defendant Kehr is directly and vicariously liable for the negligent, careless and reckless conduct of all Defendants, as outlined in the allegations above.

154.    As a result of Defendant Kehr's gross negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Brandon Kehr jointly and severally with the other defendants in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT IV – NEGLIGENCE

### Plaintiff Darin McMahon v. Threat Assessment and Tactical Solutions Group, LLC

155.    Plaintiff Darin McMahon incorporates paragraphs 1-154 of the Complaint by reference herein, as though same were set forth at length.

156.    At all relevant times hereto, Defendant TATS's owners, instructors and role players, including, but not limited to, Defendant Kehr, were acting within the scope of their employment as agents, servants, or employees of Defendant TATS and/or subcontractors.

157.    Defendant TATS is vicariously liable for the acts or omissions of their agents, servants and employees, including, but not limited to, Defendant Kehr, and the other defendants as though Defendant TATS performed the acts or omissions itself.

158.    TATS partnered with RTG and hosted and profited from the event on September 14 and 15, 2020. Kehr invited participants and trainers to bring their live weapons and live ammunition into the shoothouse and provided lockers, but did not enforce safety procedures to get the weapons into the lockers and then to lock the lockers. Kehr knew that attendees and trainers were bringing live rounds and live ammunition into the building, but he did not have safety procedures in place, and he did not enforce safety procedures to ensure that live weapons and live ammunition did not make it into the force-on-force scenarios at his facility.

159.    The TATS facility does not have any posted safety warnings or procedures. The front door of the shoothouse says "Watch Your Step", but it does not say "Live Weapons and Ammunition Prohibited in the Building."

160.    TATS knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

161.    TATS knew that Murr, Prince, Saylor, Ross and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and TATS failed to ensure their knowledge and to make sure safety guidelines were followed.

162.    Defendant Kehr is the ostensible agent of Defendant TATS, as there was a holding out to the public that TATS and its employees were affiliated with one another, either as agents, servants, employees, or in a joint venture.

163.    As a direct and proximate result of the gross negligence, recklessness and carelessness and/or reckless disregard described above, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant TATS jointly and severally with the other Defendants in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT V – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Cody Saylor

164.    Plaintiff Darin McMahon incorporates paragraphs 1-163 of the Complaint by reference herein, as though same were set forth at length.

165.    Plaintiff's injuries and damages were caused by the negligence, carelessness and recklessness of the Defendants conduct as described herein.

166.    As described more fully above, Defendant Saylor owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that he did not use a real weapon during the force-on-force scenario training.

167.    Defendant Saylor breached his duty to Plaintiff Darin McMahon by engaging in Reality Based Training in a grossly negligent and/or reckless manner, which caused serious injuries and damages to Plaintiff as described more fully above.

168.    Defendant Saylor's breaching actions and failures to act, consisted of, *inter alia*:

(a) Failing to follow proper safety regulations during the training seminar;

(b) Failing to require and ensure that particular safety policies, procedures and protocols were followed;

(c) Failing to ensure that his real gun with real bullets was not used in the training seminar;

(d) Failing to utilize UTM safety guidelines;

(e) Rushing through training and breaking the pattern of safety;

(f) Carrying his functional, loaded firearm into the TATS facility on Sunday, September 15, 2019;

(g) Failing to lock his functional, loaded firearm in a locker after returning to the TATS facility on the afternoon of Sunday, September 15, 2019;

(h) Failing to check his own equipment before beginning the Sunday afternoon simulated training scenarios;

(i) Failing to follow safety protocol, procedures, and/or policies by keeping his equipment in and preparing for the training in a room separate from the rest of the participants;

(j) Failing to submit himself to a pat down from either Defendant Murr or Defendant Prince prior to beginning the afternoon scenario on Sunday, September 15, 2019; and

(k) In other such ways as may be revealed through the normal course of discovery.

169. Saylor admits he is a shooting instructor and that he has worked with RTG in the past and that his training to become a shooting instructor was completed with RTG. During this TATS and RTG training weekend, Saylor was an agent of RTG and TATS promoting RTG and TATS and working as an instructor for Primal Defense.

170. Saylor gave a statement to the police admitting that he shot McMahon with his live weapon and live ammunition, that he did not frisk himself, and Murr and Prince did not frisk him.

171. Surveillance video of the incident shows Saylor shooting McMahon with a live weapon and rushing around between scenarios and in preparation for scenarios. He and Prince can be seen working together to prepare for scenarios and agree upon their acting roles.

172. Saylor kept his UTM and UTM man marking rounds in one of the offices which is within the staging for the shoothouse scenarios. Saylor did not keep his UTM and UTM man

marking rounds in the designated armory. He brought a blue handgun into his "office" area in a duffel bag and switches the holster out to use with the UTM gun. He takes man marking rounds and puts them in his pocket. He handed Prince a gun in the shoothouse during a scenario.

173.    Saylor knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

>    (a) Live ammunition was permitted in the training area (*see* paragraph 44 above);
>
>    (b) Functional firearms were allowed in the training area (*see* paragraph 45 above);
>
>    (c) A secure training area was not established (*see* paragraph number 44 above); and
>
>    (d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

174.    Saylor knew that Murr, Prince, Kehr, Ross and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and Saylor failed to ensure their knowledge and to make sure safety guidelines were followed.

175.    As a direct result of Defendant Saylor's actions and failures to act, Defendant Saylor entered the shoothouse equipped with a live handgun while acting out a live scenario, instructors Murr and Prince did not frisk him, and Kehr and TKD allowed live weapons into the building without enforcing safety protocols, procedures and policies.

176.    As a direct result of Defendant Saylor's actions and failures to act, he shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

177.    As such, Defendant Saylor is directly and vicariously liable for the negligent, careless and reckless conduct of all Defendants, as outlined in the allegations above.

178.    As a result of Defendant Saylor's gross negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Saylor jointly and severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT VI – NEGLIGENCE PER SE

### Plaintiff Darin McMahon v. Defendant Cody Saylor

179.    Plaintiff Darin McMahon incorporates paragraphs 1-178 of the Complaint by reference herein, as though same were set forth at length.

180.    On January 14, 2020, Defendant Saylor was arrested by the Stroud Regional Police Department and charged with Aggravated Assault, Simple Assault, Recklessly Endangering Another Person, and Discharge of a Firearm Into an Occupied Structure.

181.    At the preliminary hearing, Defendant Saylor waived his right to a hearing in exchange for the charge of Discharging a Firearm Into an Occupied Structure being withdrawn and the court held over the other charges at a prima facie level.

182.    Defendant Saylor's formal arraignment on the remaining charges is scheduled for June 3, 2020 before Judge Jennifer Harlacher Sibum in the Monroe County Court of Common Pleas.

183.    Title 18 § 2702 §§ A1, Aggravated Assault, is a Pennsylvania criminal statute that makes it a crime to "attempt to cause serious bodily injury to another, or cause such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." This crime is graded as a felony of the first degree.

184.    Title 18 § 2701 §§ A1, Simple Assault, is a Pennsylvania criminal statute that makes it a crime to "attempt to cause or intentionally, knowingly or recklessly cause bodily injury to another." This crime is graded as a misdemeanor.

185.    Title 18 § 2705, Recklessly Endangering Another Person, is a Pennsylvania criminal statute that makes it a crime to "recklessly engage in conduct which places or may place another person in danger of death or serious bodily injury." This crime is graded as a misdemeanor of the second degree.

186.    The above-mentioned statutes were enacted to protect people from serious bodily injury caused by the criminal actions described herein. Plaintiff Darin McMahon falls under the class of people these criminal statutes were designed to protect.

187.    Defendant Cody Saylor violated all of the above-mentioned criminal statutes by bringing his live, functional firearm into the force-on-force training scenario and shooting Darin McMahon in the neck with a 9mm bullet disregarding safety.

188.    As a direct and proximate result of Defendant Saylor's direct violations of the above-mentioned criminal statutes, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Saylor jointly and severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT VII – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Primal Defense Training, LLC

189.    Plaintiff incorporates paragraphs 1-188 of the Complaint by reference herein, as though same were set forth at length.

190.    Primal Defense partnered with RTG for the TATS event and Primal Defense owed a duty to McMahon to keep him out of harm's way and to ensure that safety protocols, procedures and policies were followed and that Saylor would not use a real weapon during the force-on-force scenario training.

191.    Cody Saylor owns and operates as a trainer for Primal Defense. Saylor was working with RTG and Primal Defense as a trainer during the shooting incident. During the weekend of training, including the time of the incident, Saylor was marketing and promoting his business with Primal Defense and working as a Primal Defense trainer and RTG trainer.

192.    Saylor admits he is a shooting instructor and that he has worked with RTG in the past and that his training to become a shooting instructor was completed with RTG.

193.    Cody Saylor gave a statement to the police admitting that he shot McMahon with his live weapon and live ammunition, he did not frisk himself, and Murr and Prince did not frisk him.

194.    Surveillance video of the incident shows Saylor shooting McMahon with a live weapon and Saylor rushing around between scenarios and in preparation for scenarios.

195.    Saylor kept his UTM and UTM man marking rounds in one of the offices, which is within the staging for the shoothouse scenarios, and did not keep his UTM and UTM man marking rounds in the designated armory.

196.    Saylor knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

197.    Saylor knew that Murr, Prince, Kehr, Ross and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and Saylor failed to ensure their knowledge and to make sure safety guidelines were followed.

198.    At all relevant times hereto, Defendant Primal's owners, instructors and role players, including, but not limited to, Defendant Saylor, were acting within the scope of their employment as agents, servants, or employees of Defendant Primal.

199.    Defendant Primal is vicariously liable for the acts or omissions of their agents, servants and employees, including, but not limited to, Defendant Saylor, as though Defendant Primal performed the acts or omissions itself.

200.    Defendant Saylor is the ostensible agent of Defendant Primal, as there was a holding out to the public that Primal and its employees were affiliated with one another, either as agents, servants, employees, or in a joint venture.

201.    As a direct and proximate result of the gross negligence, recklessness and carelessness and/or reckless disregard described above, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Primal jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT VIII – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Nathan Murr

202.   Plaintiff Darin McMahon incorporates paragraphs 1-202 by reference herein, as though same were set forth at length.

203.   Plaintiff's injuries and damages were caused by the negligence, carelessness and recklessness of the Defendants conduct as described herein.

204.   As described more fully above, Defendant Murr owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that Defendant Saylor did not use a real weapon during the force-on-force scenario training.

205.   Defendant Murr breached his duty to Plaintiff Darin McMahon by engaging in Reality Based Training in a grossly negligent and/or reckless manner, which caused serious injuries and damages to Plaintiff as described more fully above.

206.   Defendant Murr's breaching actions and failures to act, consisted of, *inter alia*:

(a) failing to follow proper safety regulations during the training seminar;

(b) failing to have and to require and ensure that particular safety policies, procedures and protocols were followed;

(c) permitting or failing to prevent grossly negligent or otherwise tortious conduct with instrumentalities under Defendants' control, including allowing real live weapons into the building and allowing Defendant Saylor to participate in the Sunday, September 15, 2019 afternoon scenario equipped with a functional, loaded handgun;

(d) failing to ensure that real guns with real bullets were not used in the training seminar;

(e) failing to enforce rules, regulations, and safety policies, procedures and protocols requiring that real guns with real bullets do not enter the facility;

(f) allowing and permitting real guns with real bullets in the TATS facility;

(g) failing to utilize UTM safety guidelines;

(h) failing to train participants on UTM safety guidelines, including, but not limited to, failure to check twice and utilize the buddy system;

(i) allowing non-law enforcement and non-military participants to use UTM modified handguns and UTM Man-Marking rounds;

(j) allowing legal presentations during training breaking the pattern of safety;

(k) rushing through training and breaking the pattern of safety;

(l) failing to frisk Defendant Saylor or utilize a metal detecting wand responsibly;

(m) failing to have measures in place to contact emergency personnel immediately; and

(n) in other such ways as may be revealed through the normal course of discovery.

207.    At his deposition Murr admitted that he was invited to be the lead instructor for the weekend event September 14 and 15 at the TATS shoothouse, that he was paid $600 by RTG to be the lead instructor and that he handed out the TATS and RTG waivers.

208.    In his statement to police, Defendant Saylor stated that Murr was the lead instructor and that no one was frisked for real weapons and real ammunition after lunch and preceding the instant shooting incident.

209.    Murr admitted that he received force-on-force training in the military and yet he failed to follow safety procedures during the weekend at TATS, in the least by not frisking

Saylor and by allowing live weapons and live rounds into the building, and said failure permitted Saylor to enter the shoothouse with a real weapon carrying live ammunition and permitted him to participate in a force on force scenario with a live gun causing McMahon to be shot in the neck with a live round of ammunition.

210.    Murr knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

> (a) Live ammunition was permitted in the training area (*see* paragraph 44 above);
>
> (b) Functional firearms were allowed in the training area (*see* paragraph 45 above);
>
> (c) A secure training area was not established (*see* paragraph number 44 above); and
>
> (d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

211.    Murr knew that Prince, Saylor, Kehr and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and Murr failed to ensure their knowledge and to make sure safety guidelines were followed.

212.    As a direct result of Defendant Murr's actions and failures to act, Defendant Saylor entered the shoothouse equipped with a live handgun while acting out a live scenario, instructors Murr and Prince did not frisk him, and Kehr allowed live weapons into the building.

213.    As a direct result of Defendant Murr's actions and failures to act, Defendant Saylor shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

214.    As such, Defendant Murr is directly and vicariously liable for the negligent, careless and reckless conduct of all Defendants, as outlined in the allegations above.

215.     As a result of Defendant Murr's gross negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Murr, jointly and severally, in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest and delay damages.

## COUNT IX – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Joshua Prince

216.     Plaintiff Darin McMahon incorporates paragraphs 1-215 of the Complaint by reference herein, as though same were set forth at length.

217.     Plaintiff's injuries and damages were caused by the gross negligence, carelessness and recklessness of Defendant Prince's conduct as described herein.

218.     As described more fully above, Defendant Prince owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that instructor-role player Cody Saylor did not use a real weapon during the force-on-force scenario training.

219.     Defendant breached his duty to Plaintiff Darin McMahon by engaging in Reality Based Training force on force negligently, recklessly and carelessly, which caused serious injuries and damages to Plaintiff as described more fully above.

220.     Defendant Prince's breaching actions and failures to act, consisted of, *inter alia*:

(a) Failing to follow proper safety regulations during the training seminars;

(b) Failing to ensure that particular safety policies, procedures and protocols were followed;

(c) Permitting or failing to prevent grossly negligent or otherwise tortious conduct upon premises or with instrumentalities under Defendants' control, including allowing Defendant Saylor to participate in the Sunday, September 15, 2019 afternoon scenario equipped with a functional, loaded handgun;

(d) Failing to ensure that real guns with real bullets were not used in the training seminar;

(e) Failing to enforce rules, regulations, and safety policies, procedures and protocols requiring that real guns with real bullets do not enter the facility;

(f) Failing to utilize UTM safety guidelines;

(g) Conducting legal presentations during training, breaking the pattern of safety;

(k) Rushing through training and breaking the pattern of safety;

(l) Failing to frisk Defendant Saylor or utilize a metal detecting wand responsibly;

(m) Participating in force-on-force training as a role player without proper qualification, certification or training;

(n) Allowing Defendant Saylor to store his gear and prepare for training scenarios in a room separate and away from the armory or safe; and

(o) In other such ways that may be determined through the regular course of discovery.

221.   Prince holds himself out and advertises to the public as a shooting instructor and second amendment lawyer through his Civil Rights Defense Firm and the Firearms Industry Consulting Group division of the firm.

222.   Prince was acting within the scope of his employment at Civil Rights and Prince Law at the TATS shoothouse event. Ross partnered with Prince, Civil Rights and Prince Law to

instruct participants on the legal ramifications of using a weapon in self-defense scenarios. Prince gave legal advice and a legal presentations to the participants with regard to the second amendment, self-defense issues and the ramifications of using justifiable force with a deadly weapon, at the TATS facility with the permission of TATS, RTG and TKD.

223.     Prince parked his car in front of TATS and his rear window advertises "FirearmsIndustryConsultingGroup.com The Right to Keep and Bear Arms Shall not Be Infringed… Any Questions? 610.845.3803" and his license plate says "GunLwyr".

224.     During the class Prince gave instruction regarding shooting and he also gave legal advice. Additionally, Prince prepared the waivers for TATS and RTG as a lawyer with specialized knowledge of general negligence and gross negligence and therefore he knows the difference between negligence and gross negligence.

225.     Prince was shot by a man marking round and he had a bloody cut on his forehead from getting shot with a man marking round during a scenario. Getting shot by a man marking round could happen during scenarios, and shooting a participant in the head with a man marking round could be seen as negligent.

226.     Prince knew that allowing real weapons and ammunition into the facility was grossly negligent and/or reckless and he also knew that failing to follow safety protocols and not frisking for real weapons and live rounds was grossly negligent and reckless.

227.     Surveillance video reveals that just seconds prior to the shooting, Prince observed Defendant Saylor getting prepared for the scenario, but allowed Saylor to enter the shooting scenario without getting frisked.

228.     Prince did not follow acceptable safety guidelines to ensure that Defendant Saylor did not use real ammunition and, in fact, the surveillance video shows Prince using Saylor's

"office" as a staging area for UTM ammunition refills, and allowing Saylor to hand him a UTM firearm inside the shoothouse just prior to a scenario.

229.    Prince allowed for an atmosphere that was not safe and without safety guidelines regarding the use of UTM firearms and functional firearms.

230.    After the shooting incident, Prince places his UTM firearm on the hood of the Jeep in the shoothouse garage and later comes back to the Jeep to evaluate if it was his firearm that had live rounds in it, indicating that Prince was not sure who actually shot McMahon with a live round.

231.    Prince knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Ross and Saylor, namely:

> (a) Live ammunition was permitted in the training area (*see* paragraph 44 above);
>
> (b) Functional firearms were allowed in the training area (*see* paragraph 45 above);
>
> (c) A secure training area was not established (*see* paragraph number 44 above); and
>
> (d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

232.    Prince knew that Murr, Ross, Saylor, Kehr and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and Prince failed to ensure their knowledge and to make sure safety guidelines were followed.

233.    As a direct result of Defendant Prince's and Prince Law actions and failures to act, Defendant Saylor entered the shoothouse equipped with a live handgun while acting out a

live scenario, and Prince did not frisk him, and Kehr and Prince allowed live weapons into the building.

234.     As a direct result of Defendant Prince's actions and failures to act, Defendant Saylor shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

235.     As such, Defendant Prince is directly and vicariously liable for the negligent, careless and reckless conduct of all Defendants and Prince is jointly and severally liable outlined in the allegations above.

236.     As a result of Defendant Prince's gross negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Joshua Prince jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive and delay damages.

## COUNT X – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Prince Law Offices, P.C.

237.     Plaintiff incorporates paragraphs 1-236 of the Complaint by reference herein, as though same were set forth at length.

238.     At all relevant times hereto, Defendant Prince Law's owners, employees, and agents including, but not limited to, Defendant Prince, were acting within the scope of their employment as agents, servants, or employees of Defendant Prince Law.

239.     Defendant Prince Law is vicariously liable for the acts or omissions of their agents, servants and employees, including, but not limited to, Defendant Prince, as though Defendant Prince Law performed the acts or omissions itself.

240.     Defendant Prince is the ostensible agent of Defendant Prince Law, RTG and TATS, as there was a holding out to the public that Prince Law and its employees were affiliated with one another, either as agents, servants, employees, or in a joint venture.

241.     As described more fully above, Defendant Prince Law Offices, P.C. owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that instructor-role player Cody Saylor did not use a real weapon during the force-on-force scenario training.

242.     Prince holds himself out and advertises to the public as a shooting instructor and second amendment lawyer through his Prince Law Offices, PC and Civil Rights Defense Firm and the Firearms Industry Consulting Group division of the firm.

243.     Prince was acting within the scope of his employment at Civil Rights and Prince Law at the TATS shoothouse event. Ross partnered with Prince, Civil Rights and Prince Law to instruct participants on the legal ramifications of using a weapon in self-defense scenarios. Prince gave legal advice and a legal presentations to the participants with regard to the second amendment, self-defense issues and the ramifications of using justifiable force with a deadly weapon, at the TATS facility with the permission of TATS and RTG.

244.     Prince parked his car in front of TATS and his rear window advertises, "FirearmsIndustryConsultingGroup.com The Right to Keep and Bear Arms Shall not Be Infringed… Any Questions? 610.845.3803" and his license plate says "GunLwyr".

245.     During the class Prince gave instruction regarding shooting and he also gave legal advice. Additionally, Prince prepared the waivers for TATS and RTG as a lawyer with specialized knowledge of general negligence and gross negligence and therefore knows the difference between negligence and gross negligence.

246.     Prince was shot by a man marking round and he had a bloody cut on his forehead from getting shot with a man marking round during a scenario. Getting shot by a man marking round may happen during scenarios, and shooting a participant in the head with a man marking round could be seen as negligent.

247.     Prince knew that allowing real weapons and ammunition into the facility was grossly negligent and/or reckless and he also knew that failing to follow safety protocols and not frisking for real weapons and live rounds was grossly negligent and reckless.

248.     Surveillance video reveals that just seconds prior to the shooting, Prince observed Defendant Saylor getting prepared for the scenario, but allowed Saylor to enter the shooting scenario without getting frisked.

249.     Prince did not follow acceptable safety guidelines to ensure that Defendant Saylor did not use real ammunition and, in fact, the surveillance video shows Prince using Saylor's "office" as a staging area for UTM ammunition refills and allowing Saylor to hand him a UTM firearm inside the shoothouse just prior to a scenario.

250.     Prince allowed for an atmosphere that was not safe and without safety guidelines regarding the use of UTM firearms and functional firearms.

251.     After the shooting incident, Prince places his UTM firearm on the hood of the Jeep in the shoothouse garage and later comes back to the Jeep to evaluate if it was his firearm that had live rounds in it, indicating that Prince was not sure who actually shot McMahon.

252.     Prince Law Offices, PC knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

253.    Prince knew that Murr, Ross, Saylor, Kehr and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and RTG failed to ensure their knowledge and to make sure safety guidelines were followed.

254.    As a direct and proximate result of the gross negligence, recklessness and carelessness and/or reckless disregard described above, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Prince Law jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive and delay damages.

## COUNT XI – NEGLIGENCE

### Plaintiff Darin McMahon v. Defendant Civil Rights Defense Firm, P.C.

255.    Plaintiff incorporates paragraphs 1-254 of the Complaint by reference herein, as though same were set forth at length.

256.    At all relevant times hereto, Defendant Civil Rights Law's owners, employees, and agents including, but not limited to, Defendant Prince, were acting within the scope of their employment as agents, servants, or employees of Defendant Civil Rights Law.

257.     Defendant Civil Rights Law is vicariously liable for the acts or omissions of their agents, servants and employees, including, but not limited to, Defendant Prince, as though Defendant Civil Rights Law performed the acts or omissions itself.

258.     Defendant Prince is the ostensible agent of Defendant Civil Rights Law, as there was a holding out to the public that Prince Law and its employees were affiliated with one another, either as agents, servants, employees, or in a joint venture.

259.     As described more fully above, Defendant Prince owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that instructor-role player Cody Saylor did not use a real weapon during the force-on-force scenario training.

260.     Prince holds himself out and advertises to the public as a shooting instructor and second amendment lawyer through his Prince Law Office, PC and Civil Rights Defense Firm and the Firearms Industry Consulting Group division of the firm.

261.     Prince was acting within the scope of his employment at Civil Rights and Prince Law at the TATS shoothouse event. Ross partnered with Prince, Civil Rights Law and Prince Law to instruct participants on the legal ramifications of using a weapon in self-defense scenarios. Prince gave legal advice and a legal presentations to the participants with regard to the second amendment, self-defense issues and the ramifications of using justifiable force with a deadly weapon, at the TATS facility with the permission of TATS and RTG.

262.     Prince parked his car in front of TATS and his rear window advertises "FirearmsIndustryConsultingGroup.com The Right to Keep and Bear Arms Shall not Be Infringed… Any Questions? 610.845.3803" and his license plate says "GunLwyr".

263.     During the class Prince gave instruction regarding shooting and he also gave legal advice. Additionally, Prince prepared the waivers for TATS and RTG as a lawyer with

specialized knowledge of general negligence and gross negligence and therefore knows the difference between negligence and gross negligence.

264.    Prince was shot by a man marking round and he had a bloody cut on his forehead from getting shot with a man marking round during a scenario. Getting shot by a man marking round may  happen during scenarios, and shooting a participant in the head with a man marking round could be seen as negligent.

265.    Prince knew that allowing real weapons and ammunition into the facility was grossly negligent and/or reckless and he also knew that failing to follow safety protocols and not frisking for real weapons and live rounds was grossly negligent and reckless.

266.    Surveillance video reveals that just seconds prior to the shooting, Prince observed Defendant Saylor getting prepared for the scenario, but allowed Saylor to enter the shooting scenario without getting frisked.

267.    Prince did not follow acceptable safety guidelines to ensure that Defendant Saylor did not use real ammunition and, in fact, the surveillance video shows Prince using Saylor's "office" as a staging area for UTM ammunition refills and allowing Saylor to hand him a UTM firearm inside the shoothouse just prior to a scenario.

268.    Prince allowed for an atmosphere that was not safe and without safety guidelines regarding the use of UTM firearms and functional firearms.

269.    After the shooting incident, Prince places his UTM firearm on the hood of the Jeep in the shoothouse garage and later comes back to the Jeep to evaluate if it was his firearm that had live rounds in it, indicating that Prince was not sure who actually shot McMahon.

270.    Prince and Civil Rights Law knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, TKD, Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

271.     Prince knew that Murr, Ross, Saylor, Kehr and TKD, were not trained and certified with regard to safety protocols, procedures and policies, and RTG failed to ensure their knowledge and to make sure safety guidelines were followed.

272.     As a direct and proximate result of the gross negligence, recklessness and carelessness and/or reckless disregard described above, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant Civil Rights Law jointly and severally with the other defendants in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive and delay damages.

## COUNT XII – NEGLIGENCE

### Plaintiff Darin McMahon v. TKD Properties, LLC

273.     Plaintiff Darin McMahon incorporates paragraphs 1-272 of the Complaint by reference herein, as though same were set forth at length.

274.     Defendant TKD owed a duty to Plaintiff Darin McMahon to keep him out of harm's way and to ensure that only activities that were safe for customers and as outlined in the

lease agreement between TKD and TATS were conducted in a manner that was safe and consistent with the provisions of said lease.

275.    The shooting and all of the injuries and damages sustained by Plaintiff Darin McMahon were the direct and proximate result of the negligent actions and inactions of Defendant TKD, consisting of, *inter alia*:

(a) Failing to enforce the provisions of the lease agreement for the premises so that no live firearms were brought onto the premises and to prevent other dangerous activities such as reality-based training;

(b) Failing to warn lessee that if live firearms were brought onto the premises, the lease would be terminated;

(c) Failing to terminate the lease when Defendant TKD knew or should have known that live firearms were brought onto the premises and dangerous, unsafe practices and activities were occurring on said property and in the building;

(d) Failing to discover that live firearms were brought onto the premises and unsafe practices, policies and procedures were utilized at TATS;

(e) Allowing live firearms to continue to be brought on the premises;

(f) Failing to inspect to ensure that live firearms were not being brought onto the premises and inspecting for dangerous, hazardous activities;

(g) Failing to use reasonable prudence in the care and maintenance of the premises;

(h) Failing to warn guests, invitees and other foreseeable users, and Plaintiff Darin McMahon in particular, of the existence of live firearms on the premises;

(i) Permitting and allowing business invitees to walk in and about the premises when Defendant knew or should have known that live firearms were being brought onto the premises;

(j) Failing to post adequate warning signs, barriers and/or barricades in an effort to alert business invitees/licensees of the existence of live firearms on the premises and/or to alert business invitees/licensees that firearms were not permitted on the premises;

(k) Failing to ensure that Defendant's lessee was providing a safe environment for guest, invitees and other foreseeable users of the premises;

(l) Permitting or failing to prevent negligent or otherwise tortious conduct by persons, whether or not servants or agents, upon premises or with instrumentalities under Defendant's control;

(m) Allowing TATS and RTG to conduct unsafe, hazardous reality-based force-on-force training and advertising and conducting same including, but not limited to, "Purge" and "Wick Mode" events allowing head and neck shooting; and

(n) In other such ways as may be revealed in the normal course of discovery.

276.   The owner and landlord of the TATS facility is Defendant TDK. TKD profited from the RTG TATS event. TKD knew that TATS and RTG were performing force on force RBT training to customers that were not law enforcement or military.

277.   TKD knew that TATS and RTG were performing force-on-force training in their building and that force-on-force training was a dangerous recreational activity, but TKD did not inspect or investigate the activities and TKD did not enforce any safety guidelines.

278.    TKD knew that TATS and RTG were allowing real weapons with live ammunition to enter the building and the failure to stop this practice ratified TATS's and RTG's conduct. As such, TDK allowed Saylor to enter the leased premises with a weapon live ammunition.

279.    TKD did not utilize nor require safety protocols, procedures and policies to prevent the negligent, reckless conduct of Saylor, the trainers and other defendants despite the fact that TKD knew that if safety procedures were not followed, there was an increased risk of a shooting with a functional firearm containing live ammunition at the shoothouse.

280.    TKD should have prohibited guns and live ammunition from the property and entering the building and yet TKD did nothing to prevent the gross negligence and reckless conduct

281.    TKD entered a lease with TATS without investigating the scope and details of force-on-force training and without requiring safety measures to be followed.

282.    TKD allowed TATS to enter a joint venture and sublet the shoothouse to RTG, Prince Law and Primal Defense without requiring safety protocols, procedures and policies to be followed.

283.    Photos and video footage collected as evidence by the Stroud Area Regional Police on September 15, 2019, reveal that the shoothouse does not have any posted safety policies, procedures or protocols.

284.    Evidence further shows that there was not a standing metal detector at the entrance to the building and Defendant Saylor's statement confirms that TATS, RTG and TKD promoted the practice of bringing live guns with live rounds in and out of the property during the event.

285.    TKD knew that IALEFI, UTM and basic safety guidelines would not be followed by TATS, Kehr, Murr, RTG,  Prince and Saylor, namely:

(a) Live ammunition was permitted in the training area (*see* paragraph 44 above);

(b) Functional firearms were allowed in the training area (*see* paragraph 45 above);

(c) A secure training area was not established (*see* paragraph number 44 above); and

(d) The "Triple Check Safety Rule" would not be followed and a Safety Officer was not designated (*see* paragraph 48 above).

286.    TKD knew that Murr, Ross, Saylor, Kehr and Prince, were not trained and certified with regard to safety protocols, procedures and policies, and RTG failed to ensure their knowledge and to make sure safety guidelines were followed.

287.    As a direct result of Defendants' actions and failures to act, Defendant Saylor shot Plaintiff with his live handgun in the neck, paralyzing Plaintiff.

288.    As such, Defendant TDK is vicariously liable for the negligent, careless and reckless conduct of all Defendants, including TATS, RTG, Saylor, Murr, Prince, Kehr and Ross as outlined in the allegations above.

289.    As a result of Defendants' negligence, recklessness and carelessness and/or reckless disregard, Plaintiff Darin McMahon has suffered physical injuries, pain and suffering, emotional distress, and mental anguish.

WHEREFORE Plaintiff Darin McMahon demands judgment in his favor and against Defendant TKD jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest, punitive damages and delay damages.

## COUNT XIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### Plaintiff Sean McMahon v. All Defendants

290.    Plaintiff Sean McMahon incorporates paragraphs 1-289 of the Complaint by reference herein, as though same were set forth fully at length.

291.    The conduct of Defendants as set forth above has caused Plaintiff Sean McMahon severe psychiatric injuries and emotional distress.

292.    Plaintiff Sean McMahon is the brother of the shooting victim Darin McMahon.

293.    Plaintiff Sean McMahon was a participant customer on Saturday and Sunday, September 14 and 15, 2020 and he was present in the shoothouse when he heard a real gun shot, then he was one of the first on scene and did witness his brother, Plaintiff Darin McMahon, lying in a pool of blood and turning purple as a result of being shot in the neck by Defendant Saylor.

294.    Further, Plaintiff Sean McMahon gave mouth-to-mouth resuscitation to his brother after the shooting, and he assisted or observed others holding Darin McMahon's neck to stop the loss of blood coming from the neck, observed or assisted in giving chest compressions and observed or assisted in seeing ambulance medical personnel giving life-saving support to Darin McMahon.

295.    The aforementioned severe psychiatric injuries and emotional distress have directly caused a physical impact on Plaintiff Sean McMahon, including, but not limited to, post-traumatic stress, sleep, inability to eat, headaches, anxiety, depression and nightmares.

WHEREFORE Plaintiff Sean McMahon demands judgment in his favor and against Defendants jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest and delay damages.

## COUNT XIV – LOSS OF CONSORTIUM

### Plaintiff Tiffany McMahon v. All Defendants

296.     Plaintiff Tiffany McMahon incorporates paragraphs 1-295 of the Complaint by reference herein, as though same were set forth at length.

297.     As a result of the incident described more fully above, Plaintiff Tiffany McMahon has been obliged to expend various and diverse sums of money for medicine and medical attention and care in and about an effort to cure her husband, Plaintiff Darin McMahon, of the injuries which he suffered and probably will in the future be obliged to continue to make such expenditures, all to her great and continuing detriment and loss.

298.     As an additional result of the incident described more fully above, Plaintiff Tiffany McMahon has been unable to attend to her usual daily duties, occupation, labors and chores, and she has been deprived of the companionship, comfort, services, assistance and consortium of her husband, Plaintiff Darin McMahon, and all of this may continue for an indefinite time in the future, all to her great and continuing detriment and loss.

WHEREFORE Plaintiff Tiffany McMahon demands judgment in her favor and against Defendants jointly and severally in an amount in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, plus costs, interest and delay damages.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this matter.

Respectfully submitted,

**THE McCLAIN FIRM**

BY: *Cary McClain*
Cary D. McClain, Esq.

*Robert Abernethy*
Robert M. Abernethy, Esq.

Attorneys for Plaintiffs

Date: June 10, 2020

**<u>VERIFICATION</u>**

I, Cary B. McClain, Esquire, state that I am the attorney for the plaintiffs in this matter and the facts set forth in the foregoing Amended Civil Complaint are true and correct to the best of my knowledge, information and belief. I verify under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2020

*Cary McClain*
Cary B. McClain, Esquire.